[Cite as *State v. Tyra*, 2017-Ohio-313.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO                     :

    Plaintiff-Appellee            :     C.A. CASE NO.   27040

                                  :

v.                                :     T.C. NO.   15CR1681

                                  :

PHILLIP R.S. TYRA                 :     (Criminal Appeal from
                                  :      Common Pleas Court)

    Defendant-Appellant           :

                                  :

. . . . . . . . . .

# O P I N I O N

Rendered on the ____27th____ day of ____January____, 2017.

. . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 36 N. Detroit Street, Suite 102, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1}  Phillip Tyra was found guilty by a jury in the Montgomery County Court of Common Pleas of two counts of murder and two counts of felonious assault, each with a firearm specification, as well as carrying a concealed weapon and trafficking in marijuana; he was found not guilty of two counts of aggravated robbery and two counts of murder.

After merging several of the counts, the trial court sentenced Tyra to an aggregate term of 20 years and six months to life in prison. Tyra appeals from his conviction.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

## I. Facts and Procedural History

{¶ 3} On May 27, 2015, Triston McDonald was shot to death in his automobile. It is undisputed that McDonald had gone to the location where the shooting occurred to purchase marijuana from Tyra and that Tyra got into the car with McDonald. What transpired inside the car is in dispute, but McDonald was shot four times and died at the scene moments after Tyra fled from the car.

{¶ 4} On June 12, 2015, Tyra was indicted on four counts of murder, each with a firearm specification, two counts of aggravated robbery (serious harm and deadly weapon), and two counts of felonious assault (serious harm and deadly weapon), each with a firearm specification, as well as one count of carrying a concealed weapon and one count of trafficking in marijuana. The case was tried to a jury in January 2016. As discussed above, Tyra was found guilty of two counts of murder and two counts of felonious assault, each with a firearm specification, and carrying a concealed weapon and trafficking marijuana. He was acquitted of two other counts of murder and two counts of aggravated robbery. After the merger of some offenses and all accompanying specifications, the trial court sentenced Tyra to fifteen years to life for murder, to three years on the firearm specification, to 18 months for carrying a concealed weapon, and to 12 months for trafficking in marijuana. The court ordered that all sentences run consecutively to each other and to the firearm specification, for an aggregate term of 20 years and six months to life.

{¶ 5} Tyra raises three assignments of error on appeal. In order to more fully develop the facts, we begin with the second assignment, which asserts that his conviction was against the manifest weight of the evidence.

## II. Weight of the Evidence

{¶ 6} In his second assignment of error, Tyra contends that his conviction was against the manifest weight of the evidence, because his version of events was not contradicted by any other testimony and was "just as likely as any version of events."

{¶ 7} The State's evidence established that McDonald and his girlfriend met Tyra at a barbershop on the Sunday of Memorial Day weekend in 2015; the men got haircuts and smoked marijuana together at the barbershop, and McDonald got Tyra's cell phone number. Tyra identified himself to McDonald as "Gates," because of his alleged resemblance to a rapper by that name; McDonald and his girlfriend did not know Tyra's real name. Tyra informed McDonald that he "always" had marijuana, "so hit him up any time."

{¶ 8} A few days later, on the morning of Wednesday, May 27, McDonald and his girlfriend left their home in Springboro and drove to Dayton on an errand for McDonald's mother. After running the errand, McDonald dropped his girlfriend off at a friend's house around 11:45 a.m. and went to a meeting he had set up with "Gates" to purchase marijuana; McDonald was supposed to return to the friend's house in less than an hour. The men met at a location chosen by Tyra, and Tyra got into McDonald's car on the passenger side. By Tyra's own admission, shots were fired moments later, and Tyra fled from the vehicle. Tyra did not report the incident to the police.

{¶ 9} When police officers and medical technicians arrived at the scene,

numerous people were standing around McDonald's vehicle, and he was slumped over in the front seat. It was determined that McDonald had died, and the police investigation began. Detective David House of the Dayton Police Department was one of the lead investigators, and he testified about the investigation at trial.

{¶ 10} According to Detective House, a cell phone and a gun were found on the floor in the front seat of McDonald's car; the phone was near McDonald's feet, and the gun was on the passenger side. Using that cell phone, which turned out to be McDonald's, the police tracked down McDonald's girlfriend, who told the police that McDonald had planned to meet with "Gates" to buy marijuana after dropping her off. A phone number for "Gates" was listed in McDonald's phone. Additionally, the girlfriend provided information about how McDonald had met "Gates" at the barber shop and about Gates's resemblance to the rapper Kevin Gates. The girlfriend also described a distinctive gun that McDonald had had in his possession in his car prior to the shooting; it had a "white Liberty sign" resembling the Statue of Liberty on the handle. The girlfriend produced a "selfie" photograph of herself and McDonald in the car that morning in which the gun was visible. The gun found in the car was not McDonald's gun.

{¶ 11} By following various leads and tracking a cell phone number to which several calls had been made the morning of the shooting, the police identified Tyra as "Gates" and as a suspect in the shooting. However, Tyra's whereabouts were unknown. After working with the U.S. Marshals Service's fugitive apprehension team, Det. House learned that Tyra was going to come in and talk with the police.

{¶ 12} During Tyra's interviews with the police, he stated that, after getting into McDonald's car on the morning of May 27, he had produced marijuana for McDonald to

smell and presumably to purchase, but then McDonald had pulled a gun out from under his right leg and pointed it at Tyra as if to rob him. Tyra reached into his front pants pockets and produced some money and other items. While McDonald was looking at the items Tyra had produced from his pockets, Tyra drew his own gun with his right hand and pushed McDonald's hand away so that McDonald's gun was no longer aiming at him (Tyra). Tyra then shot McDonald two times and ran from the car, telling a woman nearby that McDonald (who Tyra did not know by that name) had tried to rob him. Tyra went to his mother's house, packed a bag, and left for several days. He refused to reveal where he had gone, stating that he did not want to involve people who had helped him.

{¶ 13} During the interviews, Tyra also admitted that he had not called the police after he fled from McDonald's car. He stated that he did not know what had happened to his cell phone, but when confronted with evidence from Det. House that he had continued to make calls from the phone for an hour after the shooting, including calls to his mother, Tyra acknowledged these facts. When presented with the physical evidence that McDonald had been shot four times, not two, and that the locations of the shots were inconsistent with his (Tyra's) initial account, Tyra stated that he had heard additional shots as he ran from the scene and that he was not sure how many shots he had fired. Tyra stated that he may have confused some of the details because he had feared for his life.

{¶ 14} Tyra and his mother consented to the detectives' search of Tyra's room at his mother's house. During this search, detectives found seven cell phones, including one that was activated the day after the shooting, but they were not able to link any of the phones to the one Tyra had used the day of the shooting. They also found a single .38 caliber bullet. A forensic expert testified that the bullets recovered from McDonald's body

were "38 class" bullets.

{¶ 15} Forensic evidence established that McDonald had been shot four times: in the back of the head on the right side, in the shoulder on the right side, and twice in the chest. The deputy coroner testified that he could not determine the order in which the shots had been fired. However, the shot to McDonald's head was "massive" and "fatal." The shot to his shoulder and one of the shots to his chest also likely would have been fatal, as major blood vessels, his lungs, and his heart were hit by these shots. The fourth shot (the second shot to the chest) was potentially fatal. McDonald had a defensive gunshot wound on his hand. Forensic evidence further established that all four shots came from the same gun, the gun found on the passenger side floor board of McDonald's car. The gun found in the car was not McDonald's, and Tyra admitted that he had left his gun in McDonald's car when he fled. Tyra also testified that he had McDonald's gun in his hand when he fled from the car, but McDonald's gun was never recovered by the police.

{¶ 16} At trial, Tyra testified that, after McDonald had smelled the marijuana Tyra brought to him to check its quality, McDonald handed it back. Tyra was expecting payment, but instead McDonald pulled a handgun out from under his right leg. According to Tyra, McDonald said, "[G]ive me everything," and "[D]on't yell." Tyra stated that McDonald's eyes had been "raging" "like the eye of the tiger."

{¶ 17} Tyra emptied his pockets of a small amount of cash (less than $20) and a few other items. While McDonald was looking at the items, Tyra used his left arm to move McDonald's gun in a different direction, pulled out his own gun with his right hand, and shot McDonald. He then fled from the car with McDonald's gun and the marijuana;

his own gun fell to the floorboard on the passenger side, and Tyra left it there. As he ran, he yelled to a female bystander that "he tried to rob me." Tyra testified that he heard more shots as he was running away. Tyra also testified at trial that he had "no idea" how many times he had shot McDonald, because he had "blacked out or something."

{¶ 18} Tyra admitted that he initially told the police that he had shot McDonald two times and had lied about some details, such as how he had gotten to the meeting location and whether he had or used his phone after the shooting, because he was scared and did not want to go to jail. Tyra testified that he did not remember what he did with McDonald's gun after the shooting, but that he left his own gun and McDonald's drug money (which he never saw) in the car.

{¶ 19} After stopping at his mother's house to pick up some things, Tyra left town for a few days. He did not contact the police, and he refused to say where he had gone or with whom, because he did not want to "drag" anyone else into the matter.

{¶ 20} When reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 21} Further, we have held that, in reaching its verdict, the jury is free to believe, all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-

3163, ¶ 28. As the finder of fact, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, we defer to the jury's judgment on matters of credibility. *State v. Boyd,* 2d Dist. Clark No. 12 CA 85, 2014-Ohio-5571, ¶ 47.

**{¶ 22}** Self-defense is an affirmative defense for which the defendant bears the burden of proof. *State v. Allison*, 2d Dist. Montgomery No. 26885, 2016-Ohio-5262, ¶ 19.

**{¶ 23}** The jury was instructed about what Tyra was required to show to establish that he acted in self-defense, about the circumstances in which he would have had an obligation to retreat, and about justifications for the use of force. The jury was also instructed that it was not required to believe the testimony of any witness and that it could believe or disbelieve all or any part of the testimony of any witness.

**{¶ 24}** Tyra admitted to shooting McDonald, and the jury could have reasonably concluded that Tyra's claim that he had acted in self-defense, which conflicted with much of the physical evidence, lacked credibility. Although, in Tyra's view, his version of events was "just as likely" as the version presented by the State, this question was for the jury to resolve. Based on the evidence presented at trial, we cannot conclude that the jury lost its way or created a manifest miscarriage of justice in finding Tyra guilty of the offenses that it did.

**{¶ 25}** The second assignment of error is overruled.

### III. Motion in Limine Regarding the Victim's Past Conduct

**{¶ 26}** In his first assignment of error, Tyra argues that the trial court violated his

due process rights by granting the State's motion in limine and thereby excluding "evidence of [McDonald's] prior instances of conduct that would have supported [Tyra's] claim of self-defense." Specifically, the trial court held, prior to trial, that McDonald's criminal record was not admissible.

{¶ 27} Tyra did not attempt to present evidence of McDonald's criminal record or McDonald's "background" at trial. In fact, at the outset of the trial, the prosecutor reminded the court and defense counsel of the court's ruling on the motion in limine; in response, defense counsel stated that he had no objection to the court's ruling with respect to McDonald's criminal background. Defense counsel stated that the decision "may need to be revisited" with respect to reputation evidence and Tyra's "use of self defense," but he never raised the issue again.

{¶ 28} A decision on a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court on the admissibility of evidence; as such, it cannot serve as the basis for an assignment of error on appeal. *State v. Baker,* 170 Ohio App.3d 331, 2006-Ohio-7085, 867 N.E.2d 426, ¶ 9 (2d Dist.), citing *State v. Grubb*, 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142 (1986). "In virtually all circumstances finality does not attach when the motion is granted. Therefore, should circumstances subsequently develop at trial, the trial court is certainly at liberty '* * * to consider the admissibility of the disputed evidence in its actual context.' " *Id.*, quoting *Grubb* at 201-202. An appellate court need not review the propriety of a ruling on a motion in limine unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial. *Id.* Failure to object to or proffer evidence at trial based on the disposition made in a preliminary motion in limine constitutes a waiver of any challenge. *See Baker; State v.*

*Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 29; *State v. Wilson*, 2d Dist. Montgomery No. 24577, 2012-Ohio-3098, ¶ 48.

**{¶ 29}** In the absence of an objection, we review the trial court's decision for plain error. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris,* 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶ 30}** Tyra claims that he should have been allowed to introduce evidence of McDonald's prior conduct, particularly his criminal record, because the jury needed to know "what all was in his [Tyra's] mind * * * at the time that he made the decisions that he made in order to preserve his own life." However, Tyra had met McDonald on only one occasion, a few days before the shooting, and no evidence was presented that Tyra had any knowledge of McDonald's criminal record (assuming he had one) or "background." As such, Tyra failed to demonstrate that evidence of McDonald's criminal record was relevant to Tyra's state of mind. Under these circumstances, the trial court did not commit plain error in failing to admit evidence of McDonald's reputation or criminal history. *See State v. Hall*, 10th Dist. Franklin No. 04AP-17, 2005-Ohio-335, ¶ 48, *reversed on other grounds, In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174.

**{¶ 31}** The first assignment of error is overruled.

### IV.    Confrontation of Witnesses

{¶ 32} In his third assignment of error, Tyra objects to the introduction of two videos at trial in which he was interrogated by detectives. He claims that the detectives' statements and questions during these interviews were "for the purposes of trial or preparation of the criminal prosecution." He therefore seems to conclude that the statements were hearsay and that his right to confront these "witnesses" against him was violated.

{¶ 33} Decisions regarding the admissibility of evidence at trial are within the broad discretion of the trial court and will be upheld absent an abuse of discretion and material prejudice. *State v. Breneman*, 2d Dist. Champaign No. 2013 CA 27, 2015-Ohio-4783, ¶ 51, citing *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43. The relevant inquiry is whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issue. *Id.*

{¶ 34} Tyra was interviewed by detectives on two separate occasions. The first interview was conducted primarily by Detective House, with Detective Phillips of the Dayton Police Department also present. The second interview was again conducted by Detective House, with Detective Daugherty of the Montgomery County Sheriff's Office also present. In both interviews, the second detective participated, but to a much lesser degree than House. House testified at trial and was subject to cross-examination, so Tyra's concerns do not pertain to his questions or comments in the videos. The confrontation clause argument in Tyra's brief refers only to Phillips. However, because Tyra references both videos, we infer that he objects to the jury's ability to hear the comments of both Phillips and Daugherty in the recordings.

{¶ 35} With respect to Exhibit 59, the interview with House and Phillips, Tyra

describes Detective Phillips as "editorializing * * * in the background." He objected at trial to the admission of the video because Phillips did not testify at trial and could not be cross-examined.

**{¶ 36}** Although the interview was conducted primarily by Detective House and, for the most part, Phillips was silent, in a few instances Phillips participated in the conversation between House and Tyra. For example, after Tyra asserted that his hand had been "grazed" in the shooting, Phillips asked, "What do you mean, 'grazed'?" At another point, Phillips commented that the detectives had "science" or the physical evidence on their side and that Tyra's account did not "add up," and he encouraged Tyra to "explain [him]self accurately" about what transpired. At other times, Phillips's comments were more ministerial, such as explaining that Tyra could not step out for a smoke or asking if Tyra wanted a drink of water.

**{¶ 37}** In response to Tyra's objections, the trial court found that Phillips's statements in Exhibit 59 were not hearsay because they were not offered for the truth of the matter asserted, but the court agreed "to be cautious" by instructing the jury about limiting its consideration of those comments. After Exhibit 59 was played, the court instructed the jury that the statements by the detectives were "not offered for their truth," that the statements should not to be taken "as an indication of the guilt of the defendant," and that the jurors should focus on the statements made by Tyra during the interview, rather than the statements made by the detectives.

**{¶ 38}** During the interview at which Detective Daugherty was present (Exhibit 61), Daugherty's participation was also very limited. Near the end of the interview, Daugherty participated in a reenactment of the shooting and challenged Tyra's assertion

that there was no reason for someone who was only planning to buy drugs (i.e., McDonald) to bring a gun with him to a drug buy. Daugherty also pointed out that the physical evidence that McDonald was shot in the back of the head "makes it look worse" and was inconsistent with Tyra's version of events. Daugherty called Tyra a liar near the end of the interview.

{¶ 39} After Exhibit 61 was played, the court made similar findings and gave a similar instruction to the one given after Exhibit 59 was played. With respect to the interview conducted by House and Daugherty, the court found that the jury had been "sufficiently instructed and warned" that the detectives' comments were "part of the police interviewing process" and a means of confronting Tyra with evidence that contradicted his story. The court also stated that, based on its instructions, the jury knew that the detectives' statements were "not to be used by them in the deliberation other than * * * to the extent they [the statements] serve as a platform for the response of the Defendant."

{¶ 40} The trial court reasonably concluded that the detectives' statements generally and Phillips's statements in particular were not hearsay because they were not offered for the truth of the matter asserted. The jury was instructed that the detectives' statements did not constitute evidence on which it could rely; as such, Tyra's assertion that he should have been allowed to "confront" the speaker is without merit. Moreover, the court's instructions to the jury about its consideration of the videos adequately addressed any possible confusion or prejudice about the extent to which the jurors could consider the detectives' statements about the evidence against Tyra. The trial court did not abuse its discretion in allowing these videos to be played for the jury, and Tyra's right to confront the witnesses against him was not violated.

{¶ 41} The third assignment of error is overruled.

{¶ 42} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Heather N. Jans
Jay A. Adams
Hon. Michael W. Krumholtz