[Cite as *Brown v. Burnett*, 2020-Ohio-297.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| PATRICIA A. BROWN | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2019-CA-57 |
| | : | |
| v. | : | Trial Court Case No. 2015-CV-207 |
| | : | |
| HARLAN BURNETT, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of January, 2020.

. . . . . . . . . . .

H

JOSEPH P. MOORE, Atty. Reg. No. 0014362 and BRIAN HUELSMAN, Atty. Reg. No. 0055444, 262 James E. Bohanan Memorial Drive, Vandalia, Ohio 45377
　　　Attorneys for Plaintiff-Appellant

PAUL J. KAVANAGH, Atty. Reg. No. 0065418, 333 North Limestone Street, P.O. Box 1687, Springfield, Ohio 45501
　　　Attorney for Defendants-Appellees

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This case is before us on the appeal of Plaintiff-Appellant, Patricia Brown, from a jury verdict rejecting Brown's claims against Defendants-Appellees, Harlan and Mary Burnett. Brown contends that the trial court erred in upholding a magistrate's liminal decision, which prevented her from presenting expert testimony about the age of mold on property that Brown purchased from the Burnetts. In addition, Brown contends that the trial court erred in upholding the magistrate's decision to allow similar opinions from a witness presented by the Burnetts.

{¶ 2} For the reasons that follow, the magistrate did not err in failing to allow testimony from Brown's experts about the age of mold that was present in the property. While Brown's experts were qualified to discuss mold, and should have been allowed to identify mold on parts of the house other in than the interior wall cavities, that was not the relevant issue. The issue was when the mold was present, which might have supported an inference that the Burnetts had actual knowledge of the mold. However, Brown failed to make an appropriate proffer of the experts' testimony. Even if this were otherwise, Brown's experts were unable to give any specific testimony about when mold might have been present, so any potential error would have been irrelevant or harmless. The magistrate also did not abuse its discretion in allowing lay opinion testimony from a fact witness. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In 1994, Mercuri Builders constructed a one-story ranch home for the Burnetts on a lot located at 3316 Hampton Road in Springfield, Ohio. The Burnetts lived

there until 2012, when they decided to sell the home and move to a condo. They did not use a realtor; instead, they sold the home themselves. At the time, Patricia Brown was looking for a home to purchase, as she had recently been divorced. After Brown visited the Burnetts' home four times, the parties agreed on a purchase price of $163,000.

{¶ 4} A realtor drafted the real estate contract for the Burnetts, and Brown signed it. The Burnetts also signed a property disclosure form, stating that they were unaware of any previous or current water leaking, water accumulation, excess moisture, or other defects in the property, including but not limited to any areas below grade, basement, or crawl space. In addition, the Burnetts represented that they were unaware of any water or moisture-related damage to the floors, walls, or ceilings, as a result of flooding, moisture seepage, moisture condensation, ice damming, sewer overflow backup, or leaking pipes.

{¶ 5} Before closing on the property, Brown contracted with Ken Chadwick to perform a whole house inspection, which was done on June 2, 2012. Chadwick did not see any evidence of water intrusion, moisture, or mold. He was not asked to conduct a mold inspection. The closing then occurred on July 5, 2012, and Brown took possession of the property two weeks later, around July 18 or 20, 2012. However, Brown did not immediately move in because she wanted to remove wallpaper, paint, and carpet the master bedroom, which had laminate flooring. This area had originally been carpeted, but Harlan and one of his sons-in-law had installed laminate flooring in July 2009.

{¶ 6} On July 30, 2012, the carpet-layers came to install carpet and removed the laminate flooring, revealing water stains and black water marks. The bedroom floor also appeared to have been sanded. On further investigation, Brown discovered that the

discoloration continued around the perimeter of the house, and when walls were opened up, mold was discovered inside the walls of the home. In August 2012, Bruce Stege, who owned Advantage Ecological Solutions, conducted indoor air quality testing. Stege concluded that a problem existed and that Brown needed to take action to remediate the mold.

{¶ 7} On August 21, 2012, Brown hired a civil structural engineer, John Geiger, to inspect the property. Geiger found a good deal of moisture inside the property and looked outside at the weep holes, which are openings in the mortar that provide air circulation and allow moisture to escape. The house had no weep holes, and the ground outside was sinking toward the foundation. In addition, the bricks were out of alignment and in some cases, the wood wall of the home was right against the bricks, rather than having space between (called a withe), which is required for air circulation. Geiger concluded that the home had been poorly constructed in 1994, and the differences in temperature as the walls heated and then cooled allowed for formation of condensation in the walls. Because there was no way for moisture to escape, the problem began early on and snowballed until it was a problem 18 years later.

{¶ 8} After Brown reported a claim, her insurance carrier, Westfield, hired a structural forensic engineer, Leonard Rudnick, to determine the cause of the mold. Rudnick conducted a site investigation in mid-September 2012 and concluded that water damage and infiltration in the exterior wall cavities of the house had resulted from improper installation of the brick veneer on the house. Rudnick indicated that major reconstruction was required, and that an experienced architect or engineer should be hired to determine the extent of the mold growth in the wall cavities and appropriate

remediation.

{¶ 9} In September 2012, Jeffrey Testerman, the owner of TesCon, Inc., also visited the house. Testerman was a building contractor and remodeler, and he concluded that the brick needed to be removed, as there was no way to get into the wall cavities other than by removing the brick. The OSB board would also have to be removed to see how bad the damage was. Insulation would need to be removed and replaced, and after the OSB was replaced, the entire home would need to be re-bricked. In addition, the mold would need to be remediated. Ultimately, all of this was done by a company called Airway Construction at a cost of $85,000.

{¶ 10} Brown subsequently filed suit against the Burnetts, but the suit was dismissed without prejudice and was then refiled in March 2015. In the refiled action, Brown asserted two claims against the Burnetts: (1) for recission of the contract and return of money, based on the Burnetts' failure to disclose major known defects in the property; and (2) that the Burnetts were aware of the mold, that the defects were not open and obvious, and that the Burnetts had had a duty to disclose. After the Burnetts filed an answer, they filed a motion for summary judgment based on depositions taken in the prior action. The magistrate, however, overruled the motion for summary judgment, and the matter was set for trial.

{¶ 11} In August 2016, the Burnetts filed a motion in limine, seeking to exclude or limit the testimony of Brown's experts, Stege, Rudnick, Testerman, and Geiger. After holding a hearing and considering the deposition transcripts of these experts, the magistrate granted the motion in limine in part and rejected it in part. Following a three-day trial, a jury issued a verdict in favor of the Burnetts, and Brown then filed objections

with the trial court. The trial court overruled the objections and dismissed the case.

{¶ 12} While Brown timely appealed, we dismissed the appeal for lack of a final appealable order, due to issues with the judgment entry. *See Brown v. Burnett*, 2d Dist. Clark No. 2017 CA 86 (June 15, 2018). The trial court then issued another journal entry, which we again rejected, and dismissed the appeal. *See Brown v. Burnett*, 2d Dist. 2019 CA 22 (June 26, 2019). After this dismissal, the trial court filed an appropriate entry, and Brown again appealed.

## II. Liminal Ruling

{¶ 13} Brown's First Assignment of Error states that:

The Trial Court Erred as a Matter of Law by Upholding the Magistrate's Ruling to Grant Appellees' Motion in Limine Which Prevented Appellant, Patricia A. Brown at Trial From Presenting Certain Testimony and Evidence Which Affected the Jury's Verdict and Diminished Appellant's Claim.

{¶ 14} Under this assignment of error, Brown contends that she was entitled to present expert opinion concerning the age and existence of mold in the house, and that the magistrate erred in finding that the experts were not qualified under *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As noted, before trial, the Burnetts filed a motion in limine seeking to restrict the testimony of Brown's four experts, and the magistrate conducted a hearing on the matter. In its decision, the magistrate concluded that the testimony of Rudnick, Geiger, and Testerman would be limited to their eyewitness testimony about the appearance of mold inside the

wall cavities. However, the magistrate also held that Stege was qualified by specialized knowledge, training, and experience to give opinions regarding the mold in the house.

{¶ 15} Before addressing the merits of this assignment of error, we will briefly discuss the Burnetts' argument that we should apply a plain error standard of review. This is based on Brown's failure to object to the magistrate's decision on the motion in limine.

{¶ 16} The law is well-settled that errors will be considered only on a plain error basis where a party fails to properly object to a magistrate's decision. *Care Risk Retention Group v. Martin*, 191 Ohio App.3d 797, 2010-Ohio-6091, 947 N.E.2d 1214, ¶ 80 (2d Dist.). However, that rule does not apply here.

{¶ 17} The Supreme Court of Ohio has held that "a motion *in limine*, if granted, is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue. In virtually all circumstances finality does not attach when the motion is granted. Therefore, should circumstances subsequently develop at trial, the trial court is certainly at liberty ' * * * to consider the admissibility of the disputed evidence in its actual context.' " *State v. Grubb*, 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142 (1986), quoting *State v. White*, 6 Ohio App.3d 1, 4, 451 N.E.2d 533 (8th Dist.1982). In order to preserve the objection for appeal, the aggrieved party must then attempt to introduce the evidence, "by proffer or otherwise in order to enable the court to make a final determination as to its admissibility * * *." *Id*. at 203.

{¶ 18} As required, Brown proffered the evidence in question during trial. *See* Transcript of Proceedings ("Tr."), Vol. I, p. 81, and Vol. II, pp. 4-6). Brown then properly filed objections after trial to the magistrate's decision. Accordingly, we will apply the

normal standards of review for evaluating admission of evidence.

{¶ 19} Evid.R. 702 provides that:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.   To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 20} " 'Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met.' "   *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 23, quoting *State v. Nemeth*, 82 Ohio St.3d 202, 207,

694 N.E.2d 1332 (1998). We review trial court decisions on evidentiary issues for abuse of discretion. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616, 687 N.E.2d 735 (1998).

{¶ 21} An abuse of discretion means "an attitude that is unreasonable, arbitrary or unconscionable." *AAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 22} In *Daubert*, the United States Supreme Court concluded that the rules of evidence, and most particularly Fed.R. Evid. 702, "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786, 125 L.Ed.2d 469. In *Miller*, Ohio adopted *Daubert's* gatekeeping approach for trial courts. *Miller* at 613-614; *Terry*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, at ¶ 24.

{¶ 23} After *Daubert*, "the United States Supreme Court extended this gate-keeping obligation to include all expert testimony – i.e., testimony based on technical and other specialized knowledge. The court added that in assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 118, citing *Kumho*

*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

{¶ 24} In *Daubert*, the court discussed four factors that may be used to decide reliability of testimony: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) in the case of a particular scientific technique, the known or potential rate of error; and (4) whether the theory or technique is generally accepted." *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 24 (2d Dist.), citing *Daubert* at 593-594. However, "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.* at 141. Instead, "the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant." *Drummond* at ¶ 118, citing *Kumho* at 148.

{¶ 25} In the case before us, the trial court did not exclude all testimony from Brown's experts. Instead, the court said it would restrict the testimony of three experts about mold to its appearance inside wall cavities, and would permit testimony from one witness (Stege) without limitation, other than requiring that Stege's testimony could not be phrased in terms of possibilities.

{¶ 26} The claims against the Burnetts were based on their alleged failure to disclose water intrusion and mold to Brown. Under the common law, "[t]he doctrine of caveat emptor precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor." *Layman v. Binns*, 35

Ohio St.3d 176, 519 N.E.2d 642 (1988), syllabus.

{¶ 27} "An action for fraud may be grounded upon failure to fully disclose facts of a material nature where there exists a duty to speak. * * * [Thus,] a vendor has a duty to disclose material facts which are latent, not readily observable or discoverable through a purchaser's reasonable inspection." *Id.* at 178.

{¶ 28} The elements of fraud are: "(1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance." *Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, 929 N.E.2d 434, ¶ 27.

{¶ 29} In terms of statutory liability, R.C. 5302.30(D)(1) requires the Ohio director of commerce to prescribe a disclosure form that sellers of residential real property are to give purchasers. This form is "designed to permit the transferor to disclose material matters relating to the physical condition of the property to be transferred, including, but not limited to, the source of the water supply to the property; * * * the condition of the structure of the property * * * ; and any material defects in the property that are within the actual knowledge of the transferor." *Id.* Disclosures must be made in good faith. R.C. 5302.30(E)(1). "Good faith" is described as "honesty in fact in a transaction involving the transfer of residential real property". R.C. 5302.30(A)(1). The statutory requirement of providing information does not limit or abridge obligations under the common law, but there is no statutory liability for nondisclosure for matters that are "not within the

transferor's actual knowledge." R.C. 5302.30(F)(1); R.C. 5302.30(J).

**{¶ 30}** "A seller's responses or nonresponses to the questions posed by the Residential Property Disclosure Form do not warrant the good condition of the property. Rather they constitute the owner's representations concerning his actual knowledge of the condition of the property in respect to the particulars specified. A variance between the owner's representations and the truth and fact of the matters concerned may be a basis for a claim of fraud, and the seller's duty of good faith requires him to act with an honest belief or purpose in the responses he provides. However, he is not required to speculate, and is charged only to reveal the existence of conditions within his actual knowledge." *Decaestecker v. Belluardo*, 2d Dist. Montgomery No. 22218, 2008-Ohio-2077, ¶ 45.

**{¶ 31}** The above discussion indicates that under either the common law or R.C. 5302.30, sellers are not required to disclose latent defects of which they lack actual knowledge. *McCoy v. Good*, 2d Dist. Clark No. 06-CA-34, 2007-Ohio-327, ¶ 43. As a result, the pivotal issue in this case was whether the Burnetts had actual knowledge of latent defects, i.e., the presence of mold caused by water intrusion. "Fraudulent conduct may not be established by conjecture; it must be proved by direct evidence or justifiable inferences from established facts." *Doyle v. Fairfield Machine Co.*, 120 Ohio App.3d 192, 207, 697 N.E.2d 667 (11th Dist.1997). Notably, the Burnetts denied any knowledge of mold on the property, and there was no direct evidence that they had actual knowledge. Brown, therefore, attempted to prove actual knowledge through experts and inferences arising from their testimony.

**{¶ 32}** According to the trial testimony, the Burnetts' house was originally carpeted,

and carpet was replaced about 10 years later, or around 2004.  There was no evidence indicating that mold was visible in 2004, and the Burnetts denied seeing any mold or moisture when the carpet was replaced.

{¶ 33} Around 2008, the carpet in the front bedroom (called the computer room) was replaced with laminate that Harlan and one of his sons-in-law (Doug) installed. Later, in 2009 and 2010, Harlan and Doug installed laminate in the remaining two bedrooms.  During the installation of the laminate in the master bedroom in 2009, Doug noticed that the floor had been previously sanded.  Both Harlan and the builder, George Mercuri, testified that the sanding occurred at the time of the original construction of the house.  Specifically, during construction, the sheathing had absorbed a lot of rain, and a drum sander was used to sand down the seams before the final flooring was installed. *See* Tr., Vol. III at pp. 37-38 and 79.  In contrast, Brown's construction expert (John Testerman) testified that the sanding was done at a date later than the time of construction.  Tr., Vol. II, pp. 26-28.  Testerman did not explain the basis for his opinion.

{¶ 34} In late July 2012, Brown's carpet installer tore out the laminate in the master bedroom and found stains and dark discolorations on the subfloor in the master bedroom. *Id.* at pp. 171-175, and Plaintiff's Exs. 10A, B, C, D, and E.  Clearly, if the stains and discolorations (or mold) were present when the laminate was initially installed, or if the floor had been sanded to remove stains, discolorations, or mold, this would permit a trier of fact to infer that the Burnetts actually knew of water intrusion problems before selling the property.

{¶ 35} As noted, before trial, the magistrate held that the testimony of Brown's experts, Geiger, Rudnick, and Testerman, "*with regard to mold* is limited to their

eyewitness testimony regarding the appearance of mold inside the wall cavities." (Emphasis sic.)   Doc. #59, Entry, p. 1.

{¶ 36} Geiger, an experienced civil structural engineer, testified first.   Geiger testified that about half of the 3,000 projects he had worked on had involved water intrusion and that about 500 to 1,000 involved mold issues.   He also said that he was not a mold expert, but could determine what mold is and what the aftereffects would be.   Tr., Vol. I at pp. 87-88.   Geiger further testified that there was a tremendous amount of moisture in the home when he visited on August 21, 2012, that there was a "lot of mold in the house, in the walls," and that he could see it between the insulation."   Id. at pp. 90-92.   According to Geiger, the problem was caused by the poor construction of the house because it had no weep holes.   He stated that the moisture began early on and "snowballed" over the years, so that it was a major problem when he looked at it.   Id. at pp. 93-94.   Geiger further indicated that the moisture was behind the wall and had percolated into the floor.   Id. at p. 107.

{¶ 37} Notably, when proffering Geiger's testimony at trial, Brown did not indicate what Geiger's opinion was about the age of the mold.   The proffer concerning Geiger's testimony was that he "is qualified to testify as to the age of the mold and the timing of it based on his experience and education and his observations, which we believe are sufficient to allow it to be admitted to the court, presented to the jury, and for the jury to determine whether they can take the weight of it and determine it from there."   Tr., Vol. I at p. 81.

{¶ 38} Evid.R. 103(A) provides that:

> Error may not be predicated upon a ruling which admits or excludes

evidence unless a substantial right of the party is affected; and

\* \* \*

(2) Offer of Proof.   In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

{¶ 39} " 'The purpose of a proffer is to assist the reviewing court in determining, pursuant to Evid.R. 103, whether the trial court's exclusion of evidence affected a substantial right of the appellant.' "   *State v. Mullins*, 2d Dist. Montgomery No. 21277, 2007-Ohio-1051, ¶ 36, quoting *In re Walker*, 162 Ohio App.3d 303, 2005 -Ohio-3773, 833 N.E.2d 362, at ¶ 37.   Here, while a proffer was made, its lack of specificity renders meaningful review difficult.   Failing to proffer evidence at trial based on a decision made on a preliminary motion in limine waives any challenge.   *E.g., State v. Tyra*, 2d Dist. Montgomery No. 27040, 2017-Ohio-313, ¶ 28.

{¶ 40} Even if this were otherwise, Geiger stated when he was deposed that he was not trained in the science of determining when mold began to form in the house. Doc. #44, Geiger Deposition, p. 20.   The following exchange then occurred:

A.   However, I would say this, that based on my experience in looking at various homes – and I've looked at both industrial buildings, commercial buildings, maybe a couple thousand – that once a problem exists, there's the potential for mold.

Q.   Okay.   But where – let's say it starts on the top of that wall. You can't tell the date then that it got to the bottom of the wall, can you?

A.   I cannot.

Q. And do you know of any civil engineer that would be able to do that?

A. Civil or structural engineer?

Q. Yeah.

A. I don't think so, unless they had a degree in etiology or something like that.

Q. Okay. Some sort of science degree related to mold?

* * *

A. Yes, I agree.

Q. Okay. I think it's self-evident, but your sole purpose – the reason you were hired was – and I think it's in your last sentence [of your report]. It says: It represents a professional opinion as to the condition and/or structural defects found in the structure. That was your job, right?

A. Uh-huh.

Q. And you go on to say: Not including mold or insect infestation. So you're not rendering any opinion other than the condition – the structural defects that caused this problem; is that right?

A. That's right. That's basically what I am is a civil structural engineer.

Geiger Deposition at pp. 20-21.

{¶ 41} Based on our review of the evidence, Geiger was qualified to identify mold, due to his experience in dealing with it, and the magistrate erred in restricting his testimony to what he observed in interior wall cavities. However, this error was

irrelevant, because Geiger, by his own admission, had no opinion and could not express an opinion on how long the mold had been present on any surface. This was the critical issue in the case.

**{¶ 42}** Brown's next expert witness was John Testerman, an experienced building contractor, who visited the property two or three times in mid-September 2012. As noted, Testerman testified that the sanding on the master bedroom subfloor occurred after construction of the house. He also discussed what needed to be done to repair the house and the costs of construction.

**{¶ 43}** Before Testerman testified, Brown made the following proffer:

> With regards to John Testerman, we would, again, place an objection against the Court's rulings with regard to the motion in limine on Mr. Testerman's testimony regarding the age of mold. We believe that he does have the expertise and experience and should be able to testify with regard to that matter.
>
> Again, it goes to a weight issue with regards to that fact. We submitted the affidavit with regard to him being involved with, at least 25 cases remodeling the mold and the remediation therein, and he does have the qualifications in order to present evidence with regard to the age.

Tr., Vol. II at pp. 4-5.

**{¶ 44}** Again, beyond generally stating that Testerman could present evidence about age, Brown provided no specific information, and this does not provide an appropriate basis for review. *Tyra*, 2d Dist. Montgomery No. 27040, 2017-Ohio-313, at ¶ 28.

**{¶ 45}** During his deposition, Testerman stated that he could not predict how long it takes for mold to grow because of other variables that might affect the growth of the mold. Doc. #44, Testerman Deposition, p. 19. Testerman also indicated that when he visited the property the first time in mid-September 2012, he saw mold on the subfloor of the master bedroom, behind the vapor barrier in the bedroom and the drywall cavity, and in the insulation cavity between some studs. *Id.* at p. 29. He did not take a sample of the mold on the floor, nor did he test it. *Id.* He indicated that he was only going to render an opinion on the cause of the mold, not anything else. *Id.* at pp. 36-37. The following exchange also occurred:

Q. Can you tell me the date that the walls – that the mold began to form in the walls of that house?

A. Absolutely not.

Q. Okay. And a mycologist couldn't tell us that, could he?

A. I don't believe so.

Q. Can you tell me that date that mold began to form behind the baseboards in that house?

A. No.

Q. Can you tell me the date that the mold began to form on the subfloor in that house?

A. No.

* * *

Q. So you don't have any scientific or construction theory about when the mold began to form?

A.  As to a date it started to form?

Q.  Yes.

A.  No.

Testerman Deposition at pp. 37-38 and 40.

{¶ 46} Testerman did say in an affidavit and his deposition that he believed the mold had been in existence for several years and that the party who had installed the flooring had to know of its existence.  *Id.* at p. 42; *see also* Doc. #18, Testerman Affidavit, ¶ 7.  He based this opinion, as noted, on the sanding of the floor.  Testerman Deposition at pp. 42-44.  However, as we commented, the only evidence was that the sanding occurred during construction of the house.  Although Testerman believed otherwise, he could give no basis for his opinion.  Testerman also was able to testify at trial that he believed (to a reasonable degree of probability) that the sanding was done at a date later than the time of construction.  Tr., Vol. II at p. 28.  Again, by his own admission, Testerman did not know when mold appeared on the subfloor or any other part of the house.

{¶ 47} The third expert was Leonard Rudnick, an experienced structural forensic engineer.  At trial, Rudnick stated that Plaintiff's Ex. 8W, a photo of a basement end joist, showed black discoloration indicating mold growth, and that Plaintiff's Ex. 8X, a picture of the sanded subflooring, showed a water stain with a possibility of mild mold growth.  Tr., Vol. II at pp. 70-71.  The magistrate sustained a defense objection and instructed the jury to disregard any statement that Rudnick had made regarding what these discolorations were.  *Id.* at p. 71.  At the same time, the magistrate allowed Rudnick to identify mold on various other surfaces, including carpet, drywall, the baseboards, the OSB floor

sheathing, and the interior of walls. *Id.* at pp.61, 62, 76-78, 80, 81, and 82.

**{¶ 48}** Rudnick expressed the opinion at trial that the water and damage found in the exterior cavities resulted from improper installation of the brick veneer. He also recommended that Brown hire an architect to do intrusive testing on the mold and decide appropriate remediation. In addition, Rudnick believed the house needed major reconstruction. *Id.* at p. 84.

**{¶ 49}** Frankly, it made no sense to allow Rudnick to identify some mold on some surfaces and not on others. Rudnick had investigated or supervised about 17,000 property damage assignments, had been deposed around 50 times, and had been qualified as an expert witness in structural forensic engineering and construction. Doc. #44, Rudnick Deposition, pp. 5 and 10. He also had inspected "countless incidences of mold growth." *Id.* at p. 33. Moreover, while "the definitive way, * * * the absolutely scientific way to tell" if mold exists is a lab test, Rudnick stated that "you can render an opinion within a reasonable degree of engineering certainty based on experience that is mold growth." *Id.* at p. 34.

**{¶ 50}** As mentioned, "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.* 526 U.S. at 141, 119 S.Ct. 1167, 143 L.Ed.2d 238. Instead, "the trial court may, at its discretion, consider the *Daubert* factors *to the extent relevant.*" (Emphasis added.) *Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 118, citing *Kumho* at 148. The key is reliability, and even if experts are highly qualified, "their experience, by itself, does not establish the legal reliability of their opinions as applied to the facts of [a] case." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-

3561, 850 N.E.2d 683, ¶ 23.

{¶ 51} Again, in proffering Rudnick's testimony, Brown's counsel commented as follows:

Mr. Huelsman: Mr. Rudnick, Your Honor, we would proffer that Mr. Rudnick can testify with regards to the age of the mold and timing of it due to his experience and education. He's been involved in over 17,000 forensic investigations in construction and the majority of those dealing with water intrusion and then many of those with mold, as well as over 1,000 with mold in those instances as an engineer.

He has been involved in assessing the causation, as well as sometimes determining the remediation therein. We believe that his experiences and observations are sufficient enough to do that.

Tr., Vol. II at pp. 5-6.

{¶ 52} As with the other experts, the proffer did not specify the age of the mold or provide any specific details. Again, this does not provide a meaningful basis for review. *Mullins*, 2d Dist. Montgomery No. 21277, 2007-Ohio-1051, at ¶ 36; *Tyra*, 2d Dist. Montgomery No. 27040, 2017-Ohio-313, at ¶ 28.

{¶ 53} Even if this were otherwise, Rudnick's deposition also does not indicate a specific time-frame for the age of any mold. In this regard, Rudnick stated that "My opinion will be that the mold growth process began after the construction was completed 18 years ago and that process gradually progressed over a period of 18 years." Doc. #44, Rudnick Deposition, p. 42. As to the discoloration in the OSB floor sheathing, Rudnick was not able to be more specific than to say that it "would have been a

progressive development with obviously some visible very light discolorations occurring at some point in time and then progressively worsening." *Id.* at p. 43. This is very non-specific.

{¶ 54} Rudnick further stated that he could not say with any certainty when the mold developed, that he "would say, * * * because it's progressive, it would not have been * * * within the recent year. It would more likely have been earlier, but I can't say that with absolute certainty." *Id.* at p. 46.

{¶ 55} In view of the preceding discussion, the magistrate should have let these witnesses testify about their observations of mold in places other than in interior wall cavities. This was not the focus of Brown's assignment of error, however, nor was it the focus of the proffer. Instead, the issue was the age of the mold. As noted, none of the witnesses could provide an opinion on the critical point, which was how long the mold had been present on any surface observable by the Burnetts.

{¶ 56} Moreover, as the Burnetts point out, the magistrate did not restrict the testimony of one expert, Bruce Stege. Stege, who was at the property in August 2012, placed mold on the basement subfloor as of August 2011, and concluded that the mold on the floor above would have existed prior to that. Tr., Vol. II at pp. 125-129. While Stege did not identify any mold on the surface of the floor in the master bedroom, he identified water damage and mold on the wall sheathing, which he believed flowed down into the basement. *Id.* at pp. 134-135.

{¶ 57} For the reasons mentioned, we conclude that while some error potentially occurred, it would have been irrelevant or harmless. "The existence of error does not require a disturbance of the judgment unless the error is materially prejudicial to the

complaining party." *McQueen v. Goldey*, 20 Ohio App.3d 41, 44, 484 N.E.2d 712 (10th Dist.). *Accord Evans v. Thobe*, 195 Ohio App.3d 1, 2011-Ohio-3501, 958 N.E.2d 616, ¶ 32 (2d Dist.). Under Civ.R. 61, "the error must affect the substantial rights of the complaining party or substantial justice must not have been done." *Id.* "To find that substantial justice has not been done, a court must find (1) errors and (2) that without those errors, the jury probably would not have arrived at the same verdict." *Hayward v. Summa Health Sys./Akron City Hosp.*, 139 Ohio St.3d 238, 2014-Ohio-1913, 11 N.E.3d 243, ¶ 25.

{¶ 58} Even if Brown's experts had been permitted to testify as to the age of the mold, we cannot conclude that the verdict would have changed, because they were unable to state with any certainty or specificity when the mold occurred. Connecting the presence of mold to a time when the Burnetts would actually have known of it was critical, and the experts, by their own admission, could not do this. Accordingly, the First Assignment of Error is overruled.

### III. Admission of Appellees' Evidence

{¶ 59} Brown's Second Assignment of Error states that:

The Trial Court Erred as a Matter of Law by Upholding the Magistrate's Ruling that Permitted Appellees to Present Certain Testimony and Evidence That Should Not Have Been Allowed, Which Adversely Affected the Jury's Verdict.

{¶ 60} Under this assignment of error, Brown contends that the magistrate erred and ruled inconsistently by letting one of the Burnetts' fact witnesses testify about the age

of water stains in the master bedroom. Brown also claims unfair surprise because the Burnetts did not name any expert witnesses.

{¶ 61} At trial, the Burnetts presented testimony from their son-in-law, John Eben, who dropped an extra key off at the house after Brown took possession. At the time of trial, Eben was employed in the warehouse of the Purple Cow Creamery, but had previously been self-employed for about 18 years, conducting home and property inspections for mortgage companies and insurance inspections. Tr., Vol. III at pp. 53-54.

{¶ 62} After Eben arrived at the house, Brown asked if Harlan Burnett had known of any water stains in the home. Eben told Brown that he had never known of any, and that if Harlan knew, he would be sick about it. *Id.* at p. 55. Brown then asked Eben to look at the water stains and see if he could do anything about them. *Id.* Eben testified that he did look at the stains, and that "[t]here were water stains along the wall of the master bedroom, and they looked fresh. They didn't look like they had been there for a long period of time." *Id.* When Brown objected, the magistrate overruled the objection. *Id.*

{¶ 63} As noted, Brown argues that the magistrate should not have allowed this testimony when it refused to let Brown's own witnesses testify about the age of the mold. We agree with Brown to some extent. "As the proverb states, what is good for the goose is good for the gander." *Hughes v. Ohio Dept. of Commerce*, 114 Ohio St.3d 47, 2007-Ohio-2877, 868 N.E.2d 246, ¶ 17. Nonetheless, the error here was not necessarily in allowing Eben to express an opinion; as noted, any potential error was in failing to let Brown's experts testify about mold other than in the interior wall cavities. And that was

not really relevant error.

{¶ 64} Evid.R. 701 provides that if a "witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Perception connotes sense: visual, auditory, olfactory, etc. Thus, opinion testimony under Evid.R. 701 must be based on firsthand, sensory based knowledge." *Sec. Natl. Bank & Tr. Co. v. Reynolds*, 2d Dist. Greene No. 2007 CA 66, 2008-Ohio-4145, ¶ 17.

{¶ 65} Trial courts have "considerable discretion in admitting the opinion testimony of lay witnesses." *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 43 (2d Dist.). We, therefore, evaluate the court's decision for abuse of discretion, which, again, means "an attitude that is unreasonable, arbitrary or unconscionable." *AAA Ents.*, 50 Ohio St.3d at 161, 553 N.E.2d 597.

{¶ 66} Our review of the record indicates that the magistrate did not abuse her discretion in this regard. Eben's statements were clearly based on his perception and were helpful to determining a fact in issue. At trial, Brown presented evidence indicating that conditions for developing mold were present since the time the property was originally improperly constructed. The closest estimate, from Stege, was that the mold was present at some point prior to August 2011. Although the Burnetts had possession of the home at that time, that does not mean they had actual knowledge of the presence of mold.

{¶ 67} As noted, actual knowledge is required in this situation. The inference that Brown attempted to have the jury draw was that because the Burnetts had replaced the

flooring in the master bedroom at a point when mold or stains could have been present, they were aware of a water problem. Eben's testimony was relevant to this factual determination. Moreover, while the magistrate did not allow some evidence from three of Brown's experts, our prior discussion has indicated that the alleged error, even if properly preserved, was irrelevant to the issue in the case, or harmless.

{¶ 68} As to the allegation of surprise, Eben was listed on the Burnetts' pretrial statement as a witness. *See* Doc. #36, Pretrial Statement, p. 5. It is true that Eben was listed as a fact witness, but Brown could have deposed him to find out what he had to say. Moreover, the Burnetts did not attempt to qualify Eben as an expert witness, and the jury was not instructed that he had been so qualified. As a result, the magistrate did not suggest that his testimony was entitled to undue emphasis.

{¶ 69} Based on the preceding discussion, the Second Assignment of Error is overruled.


IV.   Conclusion

{¶ 70} All of Brown's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.


Copies sent to:

Joseph P. Moore
Brian Huelsman
Paul J. Kavanagh
Hon. Richard J. O'Neill