[Cite as *State v. Moreland*, 2024-Ohio-22.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29724 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 03009 |
| | : | |
| TASK MORELAND | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 5, 2024

. . . . . . . . . . .

ADAM J. ARNOLD, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Task Moreland appeals from his conviction on one count of murder with a three-year firearm specification.[1]

_____

[1] A jury found Moreland guilty on two counts of murder and two counts of felonious assault, each with a firearm specification. At sentencing, the trial court merged all counts and specifications into a single count of murder with an accompanying firearm specification.

{¶ 2} Moreland contends the trial court erred in designating the State's firearms witness as an expert where she lacked sufficient experience and her accreditation no longer existed. He challenges the legal sufficiency and manifest weight of the State's evidence, and he contests a ruling precluding evidence of the victim's prior violent tendencies. Finally, he asserts that severe juror misconduct requires a new trial.

{¶ 3} We conclude that the trial court did not abuse its discretion in designating the State's firearms witness as an expert. The jury's verdicts were supported by legally sufficient evidence and were not against the weight of the evidence. The trial court also did not abuse its discretion in precluding evidence of the victim's prior violent tendencies, and Moreland's juror-misconduct claim fails because it depends on evidence outside the record. Accordingly, the trial court's judgment will be affirmed.

## I. Factual and Procedural Background

{¶ 4} On April 14, 2019, Moreland was with his wife, Tiffany, in their apartment. According to Moreland, they began arguing about her intent to leave and spend time with another man, Kraig Rakestraw, who was the father of two of her children. Moreland claimed that Tiffany had threatened him with a loaded handgun during the argument. He attempted to disarm her, and she accidentally shot herself in the chest while struggling over the weapon. Tiffany could be heard breathing in the background when Moreland called 911 and reported the shooting. She was pronounced dead when police and medical personnel arrived.

{¶ 5} An investigation followed Tiffany's death. The coroner's office ruled that the cause of death was a gunshot wound to the chest, but the manner of death was

"undetermined." Based on evidence gathered during the investigation, however, a grand jury indicted Moreland in November 2021 on two counts of murder and two counts of felonious assault with firearm specifications.

{¶ 6} Prior to trial, Moreland filed a motion in limine to obtain a ruling on the admissibility of evidence concerning prior violent acts by Tiffany. Among other things, the alleged acts involved her shooting at him and striking a vehicle, attempting to hit him with a car, threatening to shoot him, and sending him threatening and harassing messages. Moreland sought to use this "character evidence of Tiffany's past violent behavior toward him * * * to show she was likely the person who was the aggressor and gun handler." The trial court conditionally overruled the motion, finding the evidence inadmissible unless Moreland argued self-defense.

{¶ 7} The first witness at Moreland's July 2022 jury trial was forensic pathologist Susan Brown from the coroner's office. Brown described the fatal gunshot wound as being from Tiffany's "front to back, right to left, and downward." As for the manner of death being undetermined, Brown noted the absence of markings on Tiffany's skin around the entrance wound—such as a muzzle imprint, stippling, soot, or gunpowder—that might have helped her determine how close the gun had been to Tiffany when it discharged. Brown acknowledged that a clothing barrier could explain the absence of any markings. She was unable to determine who had fired the weapon.

{¶ 8} The next two witnesses were police officers Keri Lightle and Taylor Gianangeli, who responded to the scene of the shooting. Upon entering the apartment, they saw Tiffany lying on her back on the living-room floor. She was unresponsive.

Moreland was on the ground holding her. Both officers described him as being very emotional. Gianangeli escorted Moreland outside while Lightle remained inside with police officer Dan Hall, who was putting on gloves.

{¶ 9} Evidence technician Ronald Christophers also testified as a prosecution witness. He observed the victim lying on the floor wearing a black bra and pants. He also saw a semi-automatic handgun in a chair. Christophers testified that one of the officers had moved the weapon, which originally had been on the ground to the right of Tiffany. Christophers found a nine-millimeter shell casing on the living-room floor near a closet on the side of a couch. The shell casing was located approximately 14.5 feet away from Tiffany's body. Christophers recovered a nine-millimeter bullet from the kitchen floor that had gone through the living-room wall. The bullet hole was 2.33 feet from the ground in the living room and 2.2 feet from the ground on the other side of the wall in the kitchen. Finally, Christophers collected a black shirt that that was on a chair. The shirt did not have any bullet holes in it. On cross-examination, he testified that he could not say where Moreland had been standing at the time of the shooting.

{¶ 10} The next witness was forensic scientist Mary Barger. She testified about conducting DNA testing of the handgun involved in Tiffany's death. Although Barger detected DNA on the barrel of the weapon, the quantity was insufficient to make a comparison with anyone. She was able to develop a profile, however, from DNA found on the handgrip. The profile revealed a DNA mixture coming from more than one person. Most of the DNA, which Barger described as "a major component," matched a DNA standard taken from Tiffany. Barger could not exclude Moreland as a contributor to the

mixed profile. She explained that only "one in every 2,944,000 individuals" could not be excluded from the profile. Based on her analysis, Barger agreed that either Tiffany or Moreland could have been holding the handgun.

{¶ 11} Detective David House also testified as a prosecution witness. He arrived at the scene after Tiffany had been declared dead and paramedics had left. He saw her body just inside the front door. He noted an apparent gunshot wound on the upper portion of her right breast. He did not see any evidence of charring, stippling, or soot around the wound. He also noticed the shell casing on the far side of the room near a closet.

{¶ 12} Detective House participated in an interview of Moreland later that day. During the interview, Moreland stated that Tiffany had gone outside with two of her children because their biological father, Kraig Rakestraw, had arrived to take the children out for the day. Moreland claimed an argument had ensued when Tiffany reentered the apartment, and she requested her car keys and her gun. After obtaining the gun, Tiffany went into a bathroom and racked the slide of the semi-automatic weapon. According to Moreland, she exited the bathroom and charged toward him with the gun in her left hand and a cell phone in her right hand, threatening to shoot him. The gun discharged when he tried to take it from her.

{¶ 13} During his interview, Moreland provided differing accounts about whether Tiffany had retrieved the weapon from a closet herself or whether he had obtained it for her. He also claimed that the weapon had been stored in a steel-toed boot in the closet, but investigators never found a steel-toed boot in the apartment. According to House, Moreland provided inconsistent statements about whether Tiffany took the cell phone with

her into the bathroom, whether she actually was holding the cell phone when she charged him, and whether she took a black shirt into the bathroom with her. Moreland also provided inconsistent statements about whether Tiffany was angry when she returned from outside. According to House, Moreland initially denied Tiffany was angry with Rakestraw outside. Moreland then stated that she had been angry about something. He suggested that Tiffany and Rakestraw may have been outside the apartment plotting against him. At one point during the interview, Moreland stated that he had told Tiffany he was not going to allow her to leave again with another man. He then claimed to have told Tiffany that she could spend time with Rakestraw.

{¶ 14} During the interview, Moreland stated that Tiffany had been wearing a black shirt at the time of the shooting. He claimed to have pulled the shirt down below her breast after she was shot. Moreland described the shirt as a black shirt with gray writing on the front. Investigators found the shirt inside the apartment. It was "laid out over a chair where you could see the design and the writing on front of it." Moreland later identified the shirt and confirmed that it was the one he claimed Tiffany had been wearing. However, the shirt did not have a bullet hole or blood on it.

{¶ 15} With regard to a struggle over the handgun, Moreland claimed he had grabbed the gun and turned it back toward Tiffany, who shot herself. According to House, Moreland demonstrated how he had both hands on the gun with one of them over the top of the slide. House testified that if Moreland's claim were true the gun either would not have operated properly, and the spent casing would have gotten caught in the gun, or Moreland would have sustained an injury to his hand when the slide ejected the casing.

But Moreland did not have an injured hand, and the ejected casing was found across the room. Based on Moreland's demonstration of how the shooting occurred, House estimated that the muzzle would have been about 12 inches from Tiffany's body. Despite this close distance, House did not see any stippling, soot, or charring on her body or on the bra she was wearing. As a result, he sought additional testing of the bra.

{¶ 16} The final witness was Jennifer Owens, a firearms and tool-mark examiner with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Owens had 13 years of experience with the ATF, and she supervised the firearms and tool-mark unit. Most of her experience involved examining firearms, bullets, and casings. Owens had some training and experience in making "muzzle-to-target distance" determinations, which was the subject of her testimony. She had taken a five-day course on muzzle-to-target distance determinations as part of a broader year-long training program. The five-day training involved lectures and at least a dozen "mock case scenarios." She then underwent additional training in muzzle-to-target distance determinations at the ATF laboratory, where she worked on mock cases and underwent an oral proficiency examination. When Owens began working on Moreland's case, the ATF laboratory was accredited in muzzle-to-target distance determinations. Due to the low number of such cases being submitted to the ATF, the agency subsequently decided not to renew its accreditation. Moreland's case was the second time Owens had performed real muzzle-to-target distance casework, and she had not previously testified as an expert in the field.

{¶ 17} Over defense counsel's objection to Owens' qualifications, the trial court allowed her to testify as an expert. She began by describing muzzle-to-target distance

testing as follows:

> Yes, so the muzzle-to-target distance determination or distance testing is, again, trying to detect a pattern of gunshot residue on a target—which is, by and large, clothing that we receive—and then recreating that pattern, if one is developed, in the laboratory, under laboratory conditions, by test firing at different intervals from distance to the end of the muzzle, to the end of the barrel, to that target.

Trial Transcript Vol. III at 482.

{¶ 18} Owens performed her testing using the actual handgun and ammunition taken from Moreland's apartment. She began by examining the bra Tiffany had been wearing when she was shot. Owens looked at the bra with her naked eye and using a stereo microscope. She noticed a hole near the top of the right cup but was unable to detect any smoke, soot, particulates, or gunpowder on the bra, either with her naked eye or using low-power magnification.

{¶ 19} The next step was to perform chemical testing. The process, identified by Owens as a "Griess test," involved placing a chemically-treated piece of photo paper on a garment, covering it with filter paper, and then heating the paper with an iron, causing any gunshot residue to adhere to the paper and become visible. Owens testified that Griess testing is widely accepted in her field and has "been around for decades." The idea is to identify a pattern of residue, which then can be recreated by firing the test weapon at a control target from various distances, enabling the examiner to determine the distance from which the weapon had been fired at the garment. In Moreland's case,

Griess testing of the bra did not detect the presence of any gunshot residue. A second test reacted positively to the presence of lead residue around the hole in the bra, which was expected given that a bullet had passed through it.

{¶ 20} In addition to chemically testing the bra, Owens test fired the weapon at a control target of white cotton twill panels from different distances. When performing this test, she detected some gunshot residue at a distance up to 30 inches. Discernible patterns of residue were visible up to 24 inches away from the muzzle. Given that she did not find any gunshot residue on the bra, however, Owens could not compare any pattern on the bra to the patterns produced during her test firing. As a result, she could not make any muzzle-to-target distance determination for the bullet hole in the bra. Owens also explained that she did not subject the black shirt to Griess testing because there was no bullet hole indicating that a gun had been fired at it.

{¶ 21} On cross-examination, Owens acknowledged that the presence of blood on a garment can "mask the gunshot residue," potentially making it undetectible through visual observation or chemical testing. With regard to Griess testing, she noted that blood could cause gunshot residue not to come into contact with the chemical agents. Owens also acknowledged the presence of blood on the bra. She further agreed that soot, smoke rings, and gunshot residue typically are black or gray, making them relatively harder to detect by visual examination on a black bra. She also recognized that the double-layered nature of the bra material made visual examination more difficult and that the curved shape of the bra made ironing it harder for Griess testing. Finally, Owens agreed that gunshot reside potentially could have "fallen off" as the bra was moved and handled after

the shooting.

**{¶ 22}** With regard to the shell casing found inside the apartment, Owens acknowledged that casings can end up several feet away from where they are ejected and that they "absolutely" can bounce off of hard objects like walls. At one point, Owens stated: "Yes, I've had them bounce off the railing of our water tank before and end up in the corner of the room just on a normal test firing."

**{¶ 23}** Based on the evidence presented, a jury found Moreland guilty on two counts of murder and two counts of felonious assault, each with a firearm specification. Following the verdicts, Moreland unsuccessfully moved for acquittal and for a new trial. The trial court overruled the motions. After merging allied offenses, it imposed an aggregate sentence of 18 years to life in prison on one count of murder and a firearm specification. Moreland timely appealed, advancing four assignments of error.

## II. Expert Testimony

**{¶ 24}** In his first assignment of error, Moreland challenges the trial court's qualification of Jennifer Owens as an expert on the issue of muzzle-to-target distance determinations and gunshot-residue analysis. Moreland stresses Owens' lack of prior qualification as an expert in muzzle-to-target distance testing and gunshot-residue examination. He notes too that his case was only the second time she had performed actual casework on muzzle-to-target distance testing and that the ATF has foregone accreditation in the field.

**{¶ 25}** In a second part of his argument, Moreland questions the reliability of the muzzle-to-target distance testing procedure. He infers that the procedure is not widely

accepted because the AFT discontinued its accreditation as it had few requests for experts to testify about the process. He also questions whether the design of Owens' testing reliably implemented the Griess test and whether her test was conducted in a way that yielded an accurate result.

{¶ 26} Upon review, we note that Moreland's objection at trial only encompassed Owens' qualifications to testify as an expert. He did not challenge the Griess test itself on the basis that it was unreliable. In any event, we find no merit in either aspect of his argument.

{¶ 27} The admission of expert testimony is governed by Evid.R. 702, which provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is

based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 28} Where an objection was made at trial, we review a trial court's decision to qualify a witness as an expert for an abuse of discretion. *State v. Medford*, 2d Dist. Montgomery No. 28281, 2019-Ohio-4800, ¶ 11. An abuse of discretion occurs when a trial court's decision is arbitrary, unreasonable, or unconscionable. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 29} With regard to Owens' qualifications to testify as an expert, we see no abuse of discretion in the trial court's decision. Her testimony certainly related to matters beyond the knowledge or experience of lay persons. The crux of Moreland's challenge below addressed her degree of knowledge, experience, and training on the subject of her testimony. In our view, however, she demonstrated sufficient qualifications in these areas to permit the trial court to allow her to testify as an expert.

{¶ 30} As set forth above, Owens had taken a five-day course on muzzle-to-target distance determinations as part of a broader training program. Her training involved lectures and "mock case scenarios." She received additional training on the subject at the ATF laboratory, which was accredited in muzzle-to-target distance determinations when Owens began working on Moreland's case. The ATF's subsequent decision to

discontinue its accreditation did not affect Owens' own qualifications. Moreover, the fact that the agency performed few muzzle-to-target distance determinations did not establish that the process for doing so was unreliable or invalid. Although Owens had performed little real-world casework using Griess testing to discern gunshot residue patterns, that fact went to the weight of her testimony rather than its admissibility.

{¶ 31} As for the reliability of the Griess testing process itself, Moreland's failure to object at trial limits us to plain-error review. But even if Moreland had objected, we would find no abuse of discretion in the trial court's qualification of Owens as an expert based on the reliability of the testing she performed. With regard to Griess testing generally, Owens stated that the procedure was widely accepted and had been used for decades. The State's appellate brief identifies cases from Ohio and elsewhere involving Griess testing and muzzle-to-target distance determinations, lending support to Owens' testimony about widespread use of the process.

{¶ 32} We note too that the procedure itself, as described by Owens, does not seem particularly complex. A firearm is discharged from various distances at a control target consisting of white cotton twill panels. The purpose is to identify patterns of gunshot residue. The subject garment also is subjected to examination for gunshot residue. The garment is examined with the naked eye, with a stereo microscope, and with chemical testing. If gunshot residue is found on the garment matching one of the patterns developed from the test shots, the examiner then can approximate the muzzle-to-target distance from which the garment was shot. In Moreland's case, however, Owens did not detect gunshot residue on the bra she tested. Therefore, she was unable to match a

pattern on the bra to any of the patterns she developed when test-firing the handgun. We see nothing about the foregoing process that would render the admission of Owens' testimony an abuse of discretion under Evid.R. 702. Accordingly, the first assignment of error is overruled.

### III. Weight and Sufficiency of the Evidence

{¶ 33} In his second assignment of error, Moreland challenges the legal sufficiency and manifest weight of the evidence to support the jury's verdicts. He notes that the primary source of DNA on the firearm belonged to Tiffany and that the DNA expert, Mary Barger, could not say who had fired the fatal shot. With regard to the lack of gunshot residue or other evidence of a close-range shooting on the bra, Moreland cites Jennifer Owens' recognition that various factors could have masked the presence of gunshot residue or caused it not to be present, including the shape of the bra, the nature of the material, the masking effect of blood, touching of the bra by others at the scene, and packing and shipping the bra. Moreland notes too that Owens conducted muzzle-to-target distance testing in a laboratory and that she did not know how Tiffany and Moreland were positioned at the time of the shooting. He also points out that the representative of the coroner's office, Susan Brown, ruled the manner of death undetermined because she did not know the "range of fire" or who had fired the weapon. Finally, Moreland asserts that his actions and emotional state immediately after the shooting were inconsistent with having an intent to kill his wife.

{¶ 34} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 35} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 36} With the foregoing standards in mind, we reject Moreland's legal-sufficiency and manifest-weight challenges. In essence, the State's case rested on three things: (1) statements Moreland made to police after the shooting; (2) the presence of a shell casing across the room from Tiffany's body; and (3) the absence of gunshot residue or other evidence indicative of a struggle over the firearm and a close-range shooting. In our view, the combination of this evidence was legally sufficient to support the jury's verdicts, which also were not against the weight of the evidence.

{¶ 37} With regard to his statements to the police, Moreland gave varying accounts of what had occurred inside the apartment. Among other things, he provided inconsistent statements about how Tiffany had obtained the firearm. During the first half of his interview, he repeatedly stated that he had retrieved the weapon from a living-room closet and had handed it to her. After he disclosed that Tiffany was upset and was planning to leave with Rakestraw, detectives asked why he would hand a loaded weapon to an angry woman. Moreland then changed his story and stated that Tiffany had retrieved the weapon from the closet herself. He later reverted back to his original statement that he had handed the weapon to her. He also repeatedly claimed she had been wearing a distinctive black shirt. Police later found the shirt, which did not have any blood on it or a bullet hole in it. Finally, Moreland acknowledged telling Tiffany that she was a married woman, that she previously had left him for seven days, and that he was not going to allow her to leave again with another man. This statement provided the jury with a motive for the shooting.

{¶ 38} The discovery of a shell casing across the room also was relevant to Moreland's location at the time of the shooting. Although the jury heard evidence that shell casings can bounce off of hard objects and land feet from where they were ejected, the fact that the shell casing was found approximately 15 feet from Tiffany's body on the far side of a couch supported the State's theory that Moreland had shot her from a distance. Tiffany's body was found a few feet past one end of the couch, and the casing was found near a closet, where Moreland claimed the gun normally was stored, beyond the opposite end of the couch. The floor of the apartment was carpeted, so the casing

presumably would have needed to ricochet hard off of one or more walls or pieces of furniture to land where it did if Tiffany had been shot at close range. In our view, it was within the province of the jury to give the shell casing's location some weight and to conclude instead that Moreland had retrieved the weapon from the closet and that he shot her from that location as she was preparing to leave with Rakestraw.

{¶ 39} The absence of gunshot residue on Tiffany's bra also provided support for the State's theory. Although none of the State's witnesses could identify the distance of the firearm from Tiffany when she was shot, firearms expert Owens test-fired the weapon and found discernible patterns of gunshot residue up to 24 inches away from the muzzle. Given that she did not find any gunshot reside on the bra, the State's theory was that the muzzle had been farther than that away from Tiffany when she was shot. Although Owens noted other reasons why gunshot residue might not have been found, the absence of any residue under microscopic and chemical examination remained a relevant consideration.

{¶ 40} The lack of an injury to Moreland's hand also supported the State's theory of the case. Detective House testified that if Moreland had had two hands around the gun as he claimed, the weapon either would not have operated properly, and the spent casing would have jammed in the gun, or Moreland would have sustained an injury to his hand when the slide ejected the casing. Notably, however, Moreland did not have an injured hand, and the ejected casing was found across the room. These facts supported an inference that Moreland was not struggling over the gun when it discharged.

{¶ 41} We note too that Moreland's emotional state after the shooting and his efforts to aid his wife were not inconsistent with a purposeful killing. The jury reasonably

could have found that Moreland was upset about Tiffany's plan to leave with another man, that he intentionally shot her in the chest out of anger, and that he then regretted what he had done and attempted to save her life. As for the mixed DNA profile found on the firearm's handgrip, Moreland told investigators that he and Tiffany both had fired the weapon outside on the previous New Year's Eve. We note too that Moreland could not be excluded as a contributor to the DNA mixture found on the handgrip.

{¶ 42} Viewing the evidence in a light most favorable to the prosecution, the jury reasonably could have found the charges against Moreland proven beyond a reasonable doubt. The jury also did not clearly lose its way and create a manifest miscarriage of justice. This was not an exceptional case in which the evidence weighed heavily against conviction. Accordingly, the second assignment of error is overruled.

## IV. Other-Acts Evidence

{¶ 43} In his third assignment of error, Moreland challenges the trial court's conditional overruling of his pretrial motion in limine. The trial court stated that it would not allow evidence of Tiffany's prior violent behavior unless Moreland pursued a self-defense claim rather than arguing that she accidentally shot herself. While acknowledging that self-defense and accident typically are inconsistent theories, Moreland contends the evidence should have been allowed despite his failure to claim self-defense. He explains that his argument "is not of self-defense to the crimes in which he was indicted but is self-defense in the attempted resistance and disarming of Mrs. Moreland during the physical altercation directly before the firearm was accidentally discharged, killing Mrs. Moreland." In essence, Moreland claims the shooting was an accident that occurred while he was

defending himself by trying to wrest the gun away from Tiffany. Under these circumstances, he insists the challenged evidence was relevant to his mindset and should have been admitted despite his failure to pursue a self-defense strategy.

**{¶ 44}** It is true that an incident potentially may involve both self-defense and accident. This court addressed such a situation in *State v. Marbury*, 2d Dist. Montgomery No. 19226, 2004-Ohio-1817, reasoning:

> The State argues that any error was harmless because Defendant was not entitled to a self-defense instruction. The State points out that the felonious assault charge to which the self-defense claim relates arises from the victim's gunshot injury. Because the Defendant claims that the gun fired accidentally in the course of his struggle with the victim, according to the State the Defendant's claim of accident negates his right to argue self-defense.

> Implicit in the State's argument is a view that, because a person's use of force in self-defense is necessarily a purposeful act, force that occurs accidentally doesn't qualify for self-defense. We agree with that view. However, Defendant didn't claim that he shot the victim in self-defense. Rather, he claims that he jumped into the victim's car to take his gun away in order to defend himself from being shot. The fact that the gun discharged accidentally in the course of that affray, as Defendant claims, does not negate his right to claim self-defense with respect to the force he used that led to the claimed accidental discharge.

*Id.* at ¶ 15-16.

**{¶ 45}** However, the fact that an incident may involve self-defense and accident does not help Moreland with regard to the evidentiary issue he raises. As an initial matter, he failed at trial to renew his pretrial argument regarding evidence of Tiffany's prior violent behavior. "The granting or denial of a motion in limine does not determine the admissibility of the questioned evidence." *State v. Jones*, 2d Dist. Montgomery No. 28977, 2021-Ohio-3050, ¶ 57. Rather, "[a] decision on a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court on the admissibility of evidence; as such, it cannot serve as the basis for an assignment of error on appeal." *State v. Tyra*, 2d Dist. Montgomery No. 27040, 2017-Ohio-313, ¶ 28. "Failure to object to or proffer evidence at trial based on the disposition made in a preliminary motion in limine constitutes a waiver of any challenge," and we are limited to plain-error review. *Id.* at ¶ 28-29. We see no error here, plain or otherwise, in excluding the evidence at issue.

**{¶ 46}** In his motion in limine, Moreland did not seek to use evidence of Tiffany's prior violence to establish his state of mind. Rather, he explicitly sought to use "character evidence of Tiffany's past violent behavior towards him and her prior criminal conviction to show she was likely the person who was the aggressor and the gun handler." In other words, Moreland sought to introduce evidence of Tiffany's prior bad acts to prove that she acted in conformity with that prior conduct in the present case. This is a textbook example of "propensity" or "other acts" evidence that Evid.R. 404(B) prohibits.

**{¶ 47}** To be admissible, the "evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Sutherland*, 2021-Ohio-2433, 173

N.E.3d 942, ¶ 10 (2d Dist.). Here, however, Moreland proposed introducing evidence of Tiffany's prior aggression and gun handling to establish that she was an aggressor who threatened him with a gun in this case. The trial court correctly refused to allow the evidence to be introduced for this purpose. Exclusion would have been proper even if Moreland had pursued a self-defense claim. *See*, *e.g.*, *State v. Barnes*, 94 Ohio St.3d 21, 25, 759 N.E.2d 1240 (2002) ("Given the plain language of Evid.R. 404 and 405 and the weight of compelling persuasive authority, we hold that a defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor."). Accordingly, the third assignment of error is overruled.

## V. Juror Misconduct

{¶ 48} In his fourth assignment of error, Moreland contends juror misconduct requires a new trial. This assignment of error involves his post-verdict motion for a new trial on the grounds that a black female juror may have felt threatened or pressured to change her vote to guilty. In his motion, Moreland argued:

> Subsequent to the jury being dismissed Juror 2 (a white female) expressed anger towards Juror 5 (the sole black juror – a female) to the bailiff. Juror 2 informed the bailiff that Juror 5 indicated her vote was "innocent." Juror 2 became very animated and loud in explaining what occurred and stated to the bailiff she (Juror 2) came unglued after Juror 5 indicated her vote was "innocent" and the other jurors thought Juror 2 was going to punch Juror 5.

Taking Juror 2's story as fact, her actions are troubling for a few reasons. First, her conduct during deliberations may have impacted another juror's ability to make a free, voluntary decision about the verdict. Second, Juror 2's admitted conduct towards Juror 5 (which she claims other jurors thought she was going to punch Juror 5) created a hostile environment which may have affected Juror 5's decision to change her vote from innocent to guilty. Finally, the actions of Juror 2 towards Juror 5 affected [Moreland's] right to an impartial jury under the 6th Amendment.

(Footnotes omitted.) July 28, 2022 Motion for New Trial at 9.

{¶ 49} In support of the foregoing allegations, Moreland cited "[a]n email from the bailiff to the State and defense counsel" that Moreland's counsel claimed he had received on July 22, 2022, two days after trial. Moreland did not attach the email to his new-trial motion, but he asked the trial court to make it part of the record. He also requested a hearing on his motion.

{¶ 50} The trial court overruled Moreland's motion in a January 29, 2023 written decision. It found no hearing necessary because the testimonial evidence upon which his motion depended would be inadmissible. The trial court reasoned that "to prove juror misconduct occurred, one or more jurors would have to testify as to statements or issues that occurred during jury deliberations, which is not permitted under Evid.R. 606(B)(1)." The trial court also determined that any testimony from court personnel, such as the bailiff, regarding statements of jurors following the jury deliberations would be inadmissible hearsay and also prohibited by Evid.R. 606(B)(1) as "evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying."

Although the trial court was troubled at the prospect of jurors potentially being intimidated or pressured, it stated that "the sanctity of the jury room must be protected, and jurors cannot be permitted to change their vote after it is read in open court." Finding no admissible testimony to support Moreland's allegations, the trial court overruled his motion.

{¶ 51} On appeal, Moreland fails to identify any error in the trial court's legal analysis. Instead, he focuses on the substance of his allegations regarding a hold-out juror possibly feeling threatened or intimidated by another juror. He also contends the trial court erred in failing to investigate the matter and discuss it with the parties. Attached to Moreland's appellate brief are (1) a copy of the July 22, 2022 email from the bailiff referenced above and (2) a July 18, 2023 affidavit from the bailiff that Moreland appears to have obtained in connection with his appeal. We struck both exhibits in a November 8, 2023 order, noting that neither the e-mail nor the affidavit had been filed in the trial court and that they were not part of the record on appeal.

{¶ 52} Upon review, we see no error in the trial court's rejection of the juror-misconduct claim without a hearing. The trial court correctly ruled that evidence of tension, coercion, or pressure involving the jurors during deliberations would be inadmissible under Evid.R. 606(B)(1), which provides:

Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the*

*verdict* or indictment or concerning the juror's mental processes in connection therewith. A juror's affidavit or *evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received by the court* for these purposes.

(Emphasis added.)

{¶ 53} Although Evid.R. 606(B)(2) identifies three exceptions, they do not apply. The only conceivable exception would be Evid.R. 606(B)(2)(c), which provides that a juror may testify about whether "any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court occurred." But even if the purported hold-out juror may have felt threatened or intimidated by another juror, Moreland's argument fails. The allegations in Moreland's new-trial motion do not reveal the existence of any actual threat, regardless of how others in the room felt.

{¶ 54} Moreland's motion alleged that the offensive juror became loud, angry, and "unglued." The Ohio Supreme Court has recognized, however, that shouting, coercion, and even a "real blow up" in the jury room do not entitle a defendant to a hearing on allegations of juror misconduct. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 288-298. " 'The requirement of a unanimous decision * * * does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent.' " *Id.* at ¶ 297, quoting *State v. Hessler*, 90 Ohio St.3d 108, 120, 734 N.E.2d 1237 (2000).

{¶ 55} We note too that the purported hold-out juror was polled and confirmed her

guilty verdict after deliberations. The purpose of polling is to "ascertain with certainty" that jurors have not been coerced into accepting verdicts with which they disagree. *Id.* at ¶ 299. "[O]nce a poll of the jurors has been completed and all have assented to the verdict, a juror may not thereafter rescind or modify his or her vote." *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 38. Finally, we note that a new-trial motion alleging juror misconduct must be supported by an affidavit under Crim.R. 33(C). Moreland's motion lacked an affidavit or any evidentiary support. For the foregoing reasons, the trial court did not err in overruling his motion grounded in allegations of juror misconduct. The fourth assignment of error is overruled.

## VI. Conclusion

{¶ 56} Having overruled Moreland's assignments of error, we affirm the judgment of the Montgomery County Common Pleas Court.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.